Our final case is Betton v. Belue. Mr. Battle? Yes, sir, your honor. Good to have you here, sir. Yes, sir. Thank you. If it pleases the court. My name is James Battle. I am here representing Appellant David Belue. The purpose of this appeal is to request this court to reverse the lower court's decision to deny qualified immunity from my client as to the plaintiff's excessive force claim. So that is the legal posture or the purpose of the appeal. I submit that the issue before this court is was it reasonable for David Belue to feel threatened by Julian Betton when he went into his home and Julian Betton drew a firearm on him in response. That is the issue and the action and the conduct that triggered this use of force by my client. Well, now, Mr. Betton's testimony was not that he drew a firearm on the officer. He said, I didn't get a chance to pull it up or anything. He took it out, you know, took it out of his waistband. He says, I guess the gun was by my hip. I didn't get a chance to pull it up or anything. And the next thing I remembered, I was in the hospital. Yes. So that's different from what you just told us, isn't it? He so he has it in his waistband. He steps around the corner into the den where the officers are and draws the gun in response. He said he had it down by his hip. That's correct. When I when I say draw, I mean, we have a dispute of facts is my point. And it seems to me that you're trying to characterize it as undisputed. And to me, this case is just appears to be riddled with factual disputes. When I say draw, I mean, taking it from the back of my waistband to presenting it to having it by his hip. I don't use facts represented by my client. I use the testimony of you. I thought you had to accept the facts as related by the district court. Your Honor, it's my understanding this is a de novo review. And so this is to review the facts. The facts. It's a de novo review, but the facts are accepted as related by the district court. Mm hmm. Right. That's I don't take that to be the posture. There can't be a dispute of fact here. You all have to be on the same page as to the facts. Yes, sir. Absolutely. No disagreement. We adopt those facts. I don't use my client's facts. I use Julian Benton's testimony from that. You have to step in the way. Judge Keenan related to you. He said I had the gun. I had it down right at his hip, which sounds an awful lot like Cooper, doesn't it? No, ma'am. It does not. So in Cooper, the man walks out onto the porch. He's in mere possession of the firearm. He says who's there. He thinks, you know, there's someone crawling or walking around his house. And then the officers approach him from the porch. The Cooper decision is that mere possession of the firearm is not enough to trigger a use of lethal force. The most important thing that comes in Cooper right after that is the assumption that a man who greets law enforcement with a firearm is likely to pose a deadly threat rests on the fact that the man reasonably knows that the police are, in fact, the police. Well, and that goes to – And here they lied or made false representations. Every single one of them said they knocked and identified themselves as the police. Right. And it's no longer contested that none of that's true. So all of these un-uniformed officers with no indication they're police, with no word spoken that they are the police, break into apartment with a battering ram. Without knocking. Without knocking. And a guy has a gun as the intruders come in. And he was afraid but pulled the gun. And had it at his side. Absolutely, Your Honor. And that is a great opening statement for the plaintiff's argument on the unlawful possession. Is there anything untrue about that? I'm not going to admit, you know, facts. You have to take them. I thought that our case, our case law, is that we must accept the facts as the district court articulated them. As to the use of force, the unlawful entry is not on appeal before this court. That's a question that is bothering me. Yes, sir. You seem to want to restrict the unlawful force analysis to the moment they pull the trigger. How far back does it go in your judgment? To when that engagement begins. When did that begin? When Julian Benton drew his firearm. So, nothing that happened before that, them breaking into his house unannounced, not being identified as police, none of that counted, as it did in Cooper, but it didn't count here. Yes, sir. Well, it has to be part of the mix. I mean, it seems to me that what you're doing is you're saying we don't rely on the fact of an unlawful entry. That's correct. I agree with you because the Fourth Circuit has looked at the time that the use of force was employed as opposed to other circuits. But that doesn't mean that the facts are irrelevant, that this man who saw these armed invaders, and he was nothing from the record but a nickel and dime drug dealer, a few grams of marijuana, you wouldn't think that all of these armed commandos were coming into your house. You had no idea they were police. That has to be part of the issue here. Not whether there was a legal issue of unlawful entry, but his reaction when confronted in a small space with this commando unit. Right. Okay. Julian Benton's mindset, which I believe is where the Court is focusing, is not part of the analysis in a use of force cause of action. It is from the perspective of the officer. So let's take the Court's point. No matter what the officer's conduct is, no matter what the officer's circumstances were or how they were created. For the use of force, yes, sir. No matter what. Yes, sir. And I point the Court to L.A. County versus Mendez. The Ninth Circuit raised arguments very similar to what this Court is saying, where you have this provocation. The use of force was provoked by the means of entry. I'm sorry to keep interrupting you. Yes, sir. It's okay. I can just envision armed men breaking down my front door and starting up the stairs in the dark. And let's just suppose I have a firearm and nobody shouts police. And when they appear, nobody's wearing a police uniform or identifying themselves. I think I might get the gun out. Yes, sir. Is that unreasonable? And if it's not unreasonable, then why is it reasonable for the police officers to shoot 22 times or whatever it was? 29. Yeah. How is this case a bad guess in a gray area under our law? I mean, this is just a – it doesn't even seem to be a guess. I mean, they just came in to unload on this guy. I mean, shooting 20-some times? Does it not matter – I'm sorry to interrupt, but does it not matter that it was just a marijuana charge and they decided to go there where the door was unlocked and knock it down with a battering ram and run in with no identification? Does that not matter at all? The tactics used to – you know, the SWAT-like tactics, that cause of action was dismissed by the lower court, if that's what the court is referring to. That wasn't what I was doing, but I made my point. Go ahead. Okay. So where I think the court is drawing concern is that Mr. Benton is in his home, you know, and there's a common belief – That's pretty important. He's in his home. Yes, sir. And people break down the door. Yes, sir. They don't say who they are. Yes, sir. They're not dressed as police officers. And they come in. Yes, sir. What did he do was unreasonable? He – what was – it's not that his action was unreasonable. It's that my officer's actions were reasonable. Okay. So if we construe the evidence in the light most favorable to Benton, isn't really the question we have in front of us whether it was clearly established that a group of police officers armed with weapons and battering rams can enter a home without identifying themselves as police and shoot a man who is holding a gun at his hip? Isn't that what this case is about? That is the unlawful entry cause of action. No, no, no. Can shoot a person after having done this. In other words, entered his home without identifying themselves. Forget the unlawful entry cause of action, but can do that. How is this a gray area for the police to shoot somebody 20-some times? And even if we were to give you the first shot, how do they have a right to unload 20-some shots at this man? To me – I mean, I'm sure you've looked at that video. Yes, ma'am. Of the swarm of officers going into the place. If you'll pardon my saying so, your argument strains credulity. It's just so shocking what occurred in this case for a two-day marijuana deal. They didn't think it was important to identify themselves. Why did they lie about it? Why did they lie about him firing a shot when the evidence later proved that he didn't? I'll draw a distinction between a lie and a falsehood. I don't know that the officers – what they're conscious of and what they say after. You don't admit that they lied? No, sir. You don't admit that they lied? No, sir. Okay. I draw a distinction between saying something that ends up being false and making a conscious decision to lie. Well, I'm going to sway in on this just for the heck of it. Say, in this case, they were lying. That's my judgment. Okay. Go ahead. Okay. I will – I mean, falsehoods that SLID identified. The SLID report was like a forensic, you know, physical evidence report of what happened. The – there was – we did an internal affairs investigation. Did they say they knocked? They – I don't recall that they analyzed, you know, all the entry. Did they – they say they announced? I don't recall that being in the SLID report. I guess it's that – Did they say he fired the first shot? Which one? Did the SLID report say that the officer said that Mr. Benton fired the first shot? No, the SLID report said he did not fire his gun. All right. Right, but police claimed that he did. Yes, ma'am. So you – the falsehood was that they – that he was asserted to have fired the first shot. Yes, sir. And he had not fired the first shot. Yes, sir. Okay. Waddell – Officer Waddell reported in his statement to SLID that all agents announced police presence. JA-2801. Yes, sir. Okay. In fact – That's an issue of fact. Did you – did you look at the video and see anybody moving their lips? I looked hard to see them move their lips. Right. I didn't see a single set in action. Right. And it – standing before the court today, it seems that we haven't gotten past the entry, that the unlawful entry cause of action is the focus in this argument. And I want to extract the use of force. No, it isn't. No, it isn't. The question is, did the police have a right to unload their weapons into somebody in his private home when he is standing there with a gun at his hip? Not pointed at the officers. Not firing at the officers. Do they have a right to unload their weaponry into this person? He's drawn his firearm in reaction to the – seeing the officer. He's holding it down at his hip. That's the record. It is. Okay. Am I – am I dismissed? No. Oh, okay. I thought she said next. Sometimes you're on the yellow light, but you – Okay. It feels like whatever it is, you can see it better than I can. Well, if the court – if the court views his testimony as holding it – You have to accept the facts the way they were articulated by the district court. Right. To argue this kind of an appeal. Right. It's a collateral order appeal. Yes, sir. Saying the court missed it on the excessive force claim. Yes, sir. That the court was wrong, taking the facts. That's right. As the court perceives them, the court was wrong. So, you don't want to accept those facts, it doesn't seem to me. You want to argue a different set of facts. You want to change the facts. I will directly – And you can't do that here. Right. In this kind of appeal, you just can't do it. I will directly quote Mr. Benton's testimony. It said – okay, so you have the Hensley case, which is like what we're describing here. It occurred after this raid. But where the gun is held down. The drawing of the firearm in reaction to the police is a threatening gesture. He is eight feet away from the officers at the time that he draws the firearm. Holding it down at his side, according to JA 1999-2376-77. His testimony is he got it to his hip. There's no indication that there was a pause where he's investigating. I didn't get it down. The gun was by my hip. I didn't get a chance to pull it up or anything. That's a quote from the record. Right. He was hit nine times. Twenty-nine shots were fired. Yes, sir. The next thing he remembered, he was in the hospital. Yes, sir. Somebody comes charging into my house in the middle of the night with ski masks on and weaponry and don't identify themselves as police, which, by the way, an intelligent person would do. And they come into my bedroom and I decide that it's okay to defend myself because they shouldn't be in there. Yes, sir. And, you know, Heller makes a special deal about defending my house. And I reach for my gun in my bedside table or in my secret compartment or wherever I might have such a thing. Fire away? I will answer that question in the reverse. Is the officer supposed to be shot because the entry was improper? I'm sorry. Excuse me. I'm assuming that's not an answer. No, it's not. Okay. Where in the record does it show that Officer Ballou saw Benton draw a gun? Where in the record? Can you point us to that? I believe it was in his deposition. Okay. Can you point us to the place if you'll do that on rebuttal? Absolutely. I see my time is up. Thank you. Thank you very much, sir. Mr. Goss? Nice to see you, sir. Good morning. May it please the court. I'm Narendra Goss, and along with Burton Craig, Paul Smith, and Johnny McCoy, I represent the plaintiff, Julian Benton. On April 16, 2015, 10 DEU agents converged on Mr. Benton's home. Five of those agents ran up to his front door. None of them knocked. None of them announced themselves as officers. Instead, Defendant David Ballou held open the screen door while another agent ran up with a battering ram and smashed down the front door. Mr. Ballou and two other agents then rushed into Mr. Benton's home with their semi-automatic rifles raised. Mr. Benton was walking out of his bathroom when he heard his front door being smashed down. He did not know that the men who entered were law enforcement. They did not identify themselves upon entry. They gave no warnings or commands. They were not wearing uniforms. Instead, they wore a mix of face masks, backwards baseball caps, short-sleeved shirts, long-sleeved shirts, jeans, khakis. Startled by the break-in, Mr. Benton reached for a gun in his back waistband and pulled it out and held it down by his side. He did not point it at anyone. He did not raise it. He did not fire the gun. Rather than saying anything, like police or drop your weapon, Agent Ballou and the two others fired 29 shots at Benton, hitting him nine times and paralyzing him for life. Now, to address one of your... What kind of semi-automatic rifle was that? Excuse me, Your Honor? What kind, what type of semi-automatic rifle was that? I do not recollect the precise type. It did require them to pull the trigger each time that they fired. Okay. To address one of the questions, this court's review is based on how the district court's articulation of the facts because it's coming up on an interlocutory appeal on qualified immunity. And so Your Honor is correct, and that's how this court has to look at it. And as Your Honors emphasized, the way that the magistrate judge described it is that at J.A. 2815, Mr. Benton, quote, reached for his gun and held it by his right side, at which point the officers opened fire. And obviously this is based... Did you have an argument in the district court on this, an oral argument, or was it decided on paper? There was no oral argument for either the magistrate or the district court judge. Okay. Could I just bother you with something? Yeah. Is there really a distinction, and I realize there is in the case law right now, between somebody suddenly pulling out a gun and pointing it at the floor and somebody suddenly pointing out a gun and raising it up in terms of the police officers' fear for their life? I mean, I think there is a distinction if Mr. Benton had pulled it out and raised it toward the officers. Now, I will emphasize that... The officer has a right to defend himself. Yes, Your Honor, although it's worth emphasizing that. And, you know, the defendants rely on a number of Fourth Circuit cases. But in each of those cases, the plaintiff had, before he was shot, he had disobeyed an officer's command and then reached for an apparent weapon before being shot. And, of course, disobeying the command to a known officer is crucial because someone, as this court said in Cooper, someone who greets law enforcement with a weapon, officers can presume that they are likely to be a threat. Where, however, as in Cooper, as in this case, where the home resident has no way of knowing that he is confronting law enforcement, his, quote, perfectly reasonable rationale for bearing a gun should have been apparent to the officers. Were any commands given here? No, Your Honor, on the record in the light most favorable to us... On this record, were there any commands given? No, Mr. Benton testified that there were no commands. And it wasn't just him. His neighbor, Santos Garcia, who is shown on the video as the individual who sort of is outside and kneels down, you know, he submitted a statement that the officers never identified themselves at any point. So taking the record like that, that there is no evidence of commands or warnings or anything before they started shooting. You would agree with me that if a person believes he or she is meeting an intruder, an unlawful intruder into their home, that the police cannot reasonably assume that because that person holds a weapon, he or she poses a threat? I agree with that, and I think that is squarely the holding of Cooper. And that is, you know, consistent with obviously a number of cases about the Second Amendment and the importance of the right to bear arms, particularly in defense of one's home. So you're saying that Cooper is enough then to establish or to satisfy the clearly established prong? Yes, Your Honor. Cooper is, provides... What are the key facts of similarity then? Sure. Between Cooper and this case that remove the clearly established prong from dispute here. As in Cooper, the agents here were investigating a nonviolent offense. As in Cooper, the agents had intruded on Benton's private property without identifying themselves as officers. Cooper had lived in a mobile home down in North Carolina somewhere. That's correct, Your Honor. But they had intruded upon at least the privilege of the home. Right. Yes. And certainly they were on his private property. As in Cooper, Mr. Benton had no way of knowing the intruders were law enforcement officers. As in Cooper, Mr. Benton was holding a gun by his side when he was shot. As in Cooper, Mr. Benton did not raise the gun or point it at anyone. As in Cooper, the officers did not give any commands or issue any warnings. And as in Cooper, Mr. Benton did not make any threats or disobey any commands. And so given... I think you were prepared for that question. Yes, Your Honor. So Cooper is on all fours and provides the requisite level of specificity to provide clearly established law for qualified immunity analysis. And the Supreme Court has issued decisions about qualified immunity. It has said there does not need to be a case directly on point. Well, there does not need to be, but in this case there is. And Cooper is directly on point. And were there any doubt about the constitutionality of these sorts of actions? They were eliminated in 2013 when Cooper was decided. There were several questions about the relevance of what happened in the moments before Mr. Benton was shot. And those facts are clearly relevant. Because they show that Mr. Benton had no way of knowing that these were officers. And that's why the facts about how the officers approached and failed to announce are plainly relevant in Cooper. What the officers did and did not say were relevant in Hensley. It's black-letter law that in deciding whether a use of force is objectively reasonable, one looks at the totality of the circumstances. There is no case law that you just cut off everything that occurred more than one second before the shots are fired. No authority for that whatsoever. The Mendez case, the Supreme Court case that counsel referred to, in no way supports that proposition. The Supreme Court there just said the fact that there was unconstitutional entry does not in and of itself make a reasonable use of force unreasonable. That is certainly not what we are arguing here. Although there was an unlawful entry and that issue is not here on appeal, we're not saying that unlawful entry is what makes this unreasonable. This is unreasonable on the facts just as they are. But how that entry occurred is relevant. The analysis in this case would be different if the DEU agents had not been announced or if they had identified themselves after entry or if they had issued any commands or if they had issued any warnings or if they were wearing proper uniforms. But they didn't do any of those things. You're saying all those things are relevant. All those things are relevant because when officers have completely failed to put a home resident on any sort of notice that these are law enforcement officers and they have broken into his home, they cannot presume that he is a deadly threat merely because he possesses a gun. And that's what Cooper instructs us and other cases. I'm still having trouble with this and it probably won't be resolved in this case. But I'm having trouble with the fact that what if he was a deadly threat when these troopers come running through the door, running up the stairs in ski masks with semi-automatic weapons and he acted to defend himself. He might have been a deadly threat to them. But did they get some benefit because they're police officers for that kind of conduct? I don't know. I mean, you're asking. You don't need that. Yeah. I mean, I think it's hard to say if everything were the same, but he did, in fact, point his weapon at them. That is a different case, but we don't have to confront here. To what extent are you relying today on your alternative argument that given the first shot, the other 29 were plainly unreasonable? Well, that is still a claim that we've put forward and that we put before the district court. And we, as we did in brief, we stand by that claim and that even if the first shot were lawful, the continued shooting were not. And this is a question of just what are the inferences that can be made by a jury? You know, Mr. Benton was shot at 29 times. He was hit nine times and he fell backwards and fell into the hallway. You don't know that any of Mr. Benton's shots hit him, do you? You just know that there were nine that hit him and he fired nine of the 29. That is correct, Your Honor. He could have missed with all nine of his. That is correct, although. But it might not make any difference. I'm not saying it would. Yeah, although. You're not saying that Benton shot him. I mean, the record, it's unclear whether Mr. Blue's bullets are the ones that hit Benton or how many times they did. I mess up names a lot. I apologize for that. I messed up yours when I introduced you. But taking the record, the inferences in Mr. Benton's favor are that Mr. Blue's shots did hit him. And a jury can reasonably infer that Mr. Benton did not stay standing after being hit all nine times, that he fell at some point. And it's reasonable to infer that he was shot at some point when he was lying on the ground, or shot at, given the fact that there were bullet holes close to the ground where he fell. And so based on those facts. You mean in the floor? Near the floor, yes, Your Honor. Yes, he fell near the floor. Are there bullet holes in the floor? Is that what you're saying? They are right near the floor, like on the floorboard on the wall. You can see then there's a picture in the record. I can pull this up. But it is from the slide report has a picture which shows bullet holes. And they have the kind of like tape, marking tape, where you see the bullet holes that are close to the floor on the wall, close to the floor where he had fallen. Could Mr. Benton recover if the jury were to conclude that Officer Ballew did not fire any shot that hit him? I don't know if he could recover on his excessive force claim if they somehow decided that he fired nine shots, but all of them missed. I think he could still recover against Ballew on the unlawful entry claim because the officers, including Mr. Ballew's unlawful entry, was the proximate cause of the shooting that occurred. So I think he still could recover on that basis. One other point, and just to emphasize the similarity of this case to Cooper, and defendant in his brief has sort of repeatedly said that this was a split-second action, that this is unlike the other case, unlike Cooper. And I think that's a misrepresentation of the record and a misreading of Cooper. The action here took over, took two or three seconds, which is very similar to what happened in Cooper. In Cooper, the officers were coming up towards the porch door. One of the officers stumbled over concrete, and he looks up, and the door opens, and he reacts and fires. And the plaintiff's testimony is that he was shot within seconds of emerging from his door. So Cooper is likewise a decision that involved seconds, and this case is no different. So just the short time frame in and of itself does not make their acts constitutional, nor does it entitle them to qualified immunity. One last piece here. In Cooper, the court said, as in Penna v. Porter, the court on which the court relied, that Cooper's perfectly reasonable rationale for bearing a firearm while investigating a nocturnal disturbance on his own property should have been apparent to the officers at the time of the shooting, and I think weighed into their calculation. I agree, Your Honor, that that was what this court said in 2009 in Penna. That's what this court said in Cooper in 2013, and that was the established law as of April 16, 2015, when this shooting occurred. And I think under that clearly established law, Mr. Blue's decision to shoot Mr. Benton and the number of shots that he fired against Mr. Benton constituted excessive force, and the district court's decision to deny qualified immunity should be affirmed in full. Are there any further questions? Thank you, Your Honor. Thank you very much, sir. Ms. Sand? Yes, sir. And may it please the Court. So like you, judges, I am fresh to this case and having to read all of this material, and one of the things that struck me when I was reading all of this material is that it was this thick when in reality what we're talking about here is the actual shooting itself. And what has happened today is what I thought might happen when reading all of this is that we would be led down the path of let's look at failure to train, let's look at lack of supervision, let's look at the entrance and all of those kind of things when what we're trying to get the court to focus on is whether Blue was reasonable when he decided to fire the shot. And I understand what the court is saying is that, well, it's all sort of part and parcel. It was the illegal entry, the proximate cause of the ultimate shooting, and that very well could be true. But when we go to trial, we will have the city there. We will have the opportunity, or everybody will, to be discussing whether the failure to train or the failure to supervise or the fact. That's not our focus here. Officer Blue said that Mr. Batten had extended the firearm. What he said, I believe, and let's get the chronology correct as I understand it, Officer Blue was the third person in. And I will say that because of my knowledge of law enforcement, he would have been committed whether even if he even realized at the time that they had not properly not because at that point he had a job to go in and make sure that the people who had used the ram and were in there first, he had the duty to protect them. But what I saw was that he was third person in. And even by Mr. Batten's... But I'm talking about what he said in his deposition. Yes. Did he say that Mr. Batten had extended the firearm? He said it was pointed in their direction, and he could not tell whether it was pointed at him or at the other officers. Right, exactly. And Mr. Benton's testimony is that it was not pointed in their direction. He was holding it down at his hip. So it seems to me that you are trying to ride the facts in the light most favorable to you through this proceeding. Maybe what the basic misunderstanding here is a simple anatomy because if I may, Your Honor, when someone's pulling, as he suggested, Mr. Batten, a gun from his waistband, and he gets it to his hip, even if it's pointed downward, the hip is in between the belly button and the buttocks. So we're not talking about down at the side. So let's say he pulls it from his waistband. Even if it is still in this position, the officers would... We don't know that, that it was like this. Well, that's in a light most favorable to him. Well, no. He said he was holding it down. Let me get the language again. He said, I had it down. That was his... Okay, so let's assume it's down at his hip. So that's in the light most favorable to him. Well, maybe it's down, fully extended down his side. It seems like, again, you're arguing... Yeah, I mean... That is not what he said. He said, I had it down. I didn't get a chance to pull it up or anything. He said, there I was seeing stuff moving around my house, and I think to myself, what the F? Reach for my gun, wake up into the hospital. He also says... How about saying 1999 and 2376 to 77? Okay, well, I would have to pull that one, but I'm certainly looking at the... That's what I'm quoting from. But one thing I will say, having reviewed this like you all did, I never saw anything where he said he had it at his side, and that is what the district judge accepted from the magistrate after no oral argument. Have you ever seen a case more outrageous on the facts? I would have to disagree with your Honor's interpretation of that, because remember, I'm here only for Officer Ballou. Do remember that there were a lot of other officers involved in this particular action. So, like I said, once Officer... Your client told a falsehood, too, about identifying himself. Okay, but then again, what you're trying to do is... No, no, no, it's not what I'm trying to do. I just asked you a question. Did he? Did he tell a falsehood? Yeah. Actually, in his initial statement, he didn't say anything about whether there was a knock or not. But I will tell you... But did he then, during the investigation, say that? At some point, yes, he did tell Sled that. In addition... That's a straight-out answer to a straight-out question. Okay. Go ahead. But one of the things y'all mentioned is you didn't see in the video any type of mouths moving. I certainly... I watched, because I'm looking only at Ballou. I didn't know all these other officers didn't sit through their depositions. But when he's got a gun at the man's head that was in the way between them and the door, he certainly was moving their mouth. I didn't see anybody saying police. Nobody was announcing themselves. You know, I just don't understand why we're quibbling about the record in the light most favorable to the defendant. No, ma'am. The job is to talk about the record in the light most favorable to the plaintiff. Right. And in the light most favorable to Defendant Ballou, who is the only one here today, when he comes in, third in, and a gun goes from here to light most favorable to the plaintiff, down, then what is he to do except to protect himself and the lives of his fellow officers? I'm not saying that what Benton did was unreasonable, because we're going to have to accept the version of the facts there. You're making a jury argument. This is just a total jury argument. No, ma'am. What I'm saying is if qualified immunity exists, it would certainly exist if an officer sees a gun coming up, and whether it's at the hip or pointing down... That's not the facts. ...from the waistband. That's not the facts. And our precedent is that the court, this court, us, must accept the facts as the district court articulated them when it ruled, and you're twisting around and won't accept the facts as articulated by the district court. I would suggest that this court wouldn't have job security if you could not look into the record and read what the record was and all you did... This is a special kind of appeal. You have a limited right for a police officer to appeal the denial of qualified immunity, but you have to accept the facts as articulated by the lower court and bring them up here, and that's the law. That's the law. Otherwise, you have to wait until the final order. Okay, so... You have to go to trial first. If qualified immunity would get him out of trial... Qualified immunity would basically not exist if this court were not able to look at the facts to see... We give qualified immunity to about everybody. Don't start talking to us about that. With all due respect, that's not what the Supreme Court seems to be. I'm not here, Cooper. I'm not here yet, but Cooper was denied in those circumstances, and they say that Cooper case controls it, and I have some familiarity with the Cooper case. We all do. Taking the light most favorable to the nonmoving party, what happened here was horrendous. I'll be happy to pass that along, Your Honor.  Thank you. Thank you.
judges: Robert B. King, Barbara Milano Keenan, Joseph R. Goodwin